The next case is appeal number 21-1633 Bartlett Beck v. Kazuo Okada and Mr. Goud, is that correct? That's correct, your honor. Thank you. Thank you. May it please the court, my name is Alex Goud and I'm counsel for appellant Kazuo Okada. Mr. Okada requests that this court reverse the district court's order confirming the final arbitration award issued in favor of Bartlett Beck and that it remain the matter for a new arbitration in which he is allowed to participate. Both the New York Convention and the Federal Grounds for Vacating an Arbitration Award. Who disallowed him from participating in this arbitration? Didn't he announce that he wasn't going to? The arbitration panel, your honor, and a review of the factual background might be helpful there. Well, I remember the factual background and it began with an indication from his lawyer that he simply wasn't going to come, which did not mention his health. Then there's a communication that alludes to his health, but I looked very carefully at all of this exchange. The word emergency is never used, documents are never, even a simple statement from a doctor are never transmitted to the panel, and he forbids his lawyer from going to discuss what they called the remedy. In other words, what are we going to do about this? And your reading is that this somehow was a sanctions proceeding, but it could have, the arbitrators themselves made it clear the remedy could have been to allow him to submit on papers, the remedy could have been video feed, the remedy could have been many things. For all I know, a postponement, which he never asked for. So I'm very confused about what external force prevented him from participating. I understand, your honor, and I think, as I said, I think a review of the factual background will be helpful. The very first communication from Mr. Okada's counsel to the panel was sent just days before the start of the hearing, which he indicated Mr. Okada would not be attending the hearing and asked the panel how it would like to proceed. Less than 30 minutes. That was 72 hours before it was supposed to start. Correct, correct. And the documentary evidence that we've submitted at the district court below shows that that's because Mr. Okada's heart emergency and medical emergency not allowing him to travel developed that. Nobody told, he didn't tell anybody anything about that at the time. Well, I would disagree with that characterization of the facts. He did. Going back to the beginning, though, I think it's important. I think it's not in the first communication. He didn't. That's correct, your honor. No doubt about that. The emails say what they say, but I think it's important to characterize them, which is to say the very first email from Mr. Okada's counsel to the panel indicated that Mr. Okada would not be attending and asked what panel said. We will certainly go forward with the hearing with or without Mr. Okada. At that point, any request for continuance was already denied. Why? Go ahead. Go ahead, Judge Wood. I was just going to say they're proceeding, but they then make it quite clear that, let's say the agenda for the first day is what are we going to do now after six months, Mr. Okada has decided not to appear, and there were many options on the table. He assumes the worst, but there's nothing justifying that. I would draw a distinction from the way you've characterized that. I think there are two issues. The first issue is whether Mr. Okada himself will be permitted to be present at the hearing and present argument. That issue was decided 30 minutes after his counsel told the panel that he would not be able to attend and before any further discussion. Did he and his counsel ever actually ask for an adjournment? Using those words, no, but I would suggest I would offer two responses to that. First, in his counsel's very first email, he asked the panel how it would like to proceed. Clearly not an express request for a continuance, but nonetheless raising the issue. Not raising the issue, just saying what do you want to do? Right. Without his attendance, which we would submit is at least an implied request for continuance that was then made at least somewhat clear, although again, admittedly imperfectly. There's no... Maybe I should back up. You know, you seem to be treating him as if he were some unsophisticated pro se litigant, such that the arbitration panel had an obligation to give the broadest possible reading to his statement and consider relief that he himself wasn't even asking for, but he's a sophisticated businessman able to hire the best, the brightest lawyers. I don't see we're ever asked the panel to disbone the hearing or to ask for any kind of accommodation, and that is a big problem. But if we focus, I mean, admittedly, if you focus on the central question, did he specifically say please continue the hearing? No. I mean, that's true. And he also didn't say, could I perhaps do this on the papers? You know, start on Monday, but just make it a documentary presentation on his part. Lots of work had been done, as you've stressed, in other contexts. He didn't explore video, which certainly existed as a thing. Here we are with half a video screen, but even in 2018, there were plenty of video appearances. All of those points are at least expressly true in that that communication was not made. But I think that the second part of the analysis here, the second point that I want to make about it is that there is some obligation placed on an arbitration panel to do some level of inquiry when presented with information that a party is actually unable to attend the hearing. But they were not presented with that information when they made the first statement that you're objecting to. He just announces, I'm not coming. And I don't know why an arbitration panel that's been working hard has to just say, oh, sorry, you're not coming. Let's throw our schedule out. A court wouldn't do that, I guarantee you. Well, I would point the court to the Bisnoff decision and the Ottawa office decision. And in those cases, it is correct, as is the case in most authorities on these points, that those courts also found that a denial of a continuance was appropriate. However, they had a sincere inquiry conducted by the panel. Because they had a request. And don't forget that his own statement made clear that the first and independent reason for his And he wouldn't participate unless Bartlett Beck conceded that it was invalid. What kind of an ultimatum is that? The email that you're discussing, Judge, also contained, as the next sentence, following the sentence you just described, a description of Mr. Okada's medical emergency preventing him from traveling to the United States. He didn't use the word emergency. He said, I haven't been feeling well. And he was unable to travel to the United States. I would construe that as an emergency based on the timing happening. Are you kidding? You could have an ear infection that's not an emergency. But being in an airplane would be quite uncomfortable, given the... And I actually think that's the exact point. The panel had no idea. No one did. And the reality... And whose burden was it, as Judge Rovner was saying? Does the panel have to just litigate his case for him? No. But when Mr. Okada made the panel aware of the fact that he was suffering a medical issue, however you want to characterize it, and he indicated that that prevented him from attending the hearing. It could have been food poisoning that was going to be over in 24 hours. Exactly. And the panel didn't know that. And that's the point. He had to tell them. He did tell them. No, he didn't. He just vaguely said, I'm not feeling well. And it's not until we get to the district court that we actually get this documentation that you're offering. That's correct. The panel had no idea why he said he wasn't going to be able to come, other than the fact that he said he wasn't going to be able to come because he had a medical issue. And our reading of the cases is that in order to uphold the denial of a continuance, in a case where someone is going to be defaulted for more than $50 million in particular, the panel is charged with some obligation to ask a single question, to inquire as to the nature of the medical emergency. Our jurisprudence is not so harsh as to say that when you are made aware of the fact that a litigant is claiming that they cannot attend, that the panel had to do nothing other than proceed. He didn't actually tie the medical issue. He said, and besides, or words to that effect, I'd have to find them. But he essentially says, and besides, I'm not feeling well. But he's, as Judge Rover pointed out, he starts out with, I'm just not coming because Bart Lebeck would have to admit that this whole thing is fraudulent and a mess. And in response to that- His merits position, essentially. My apologies for speaking over you. And in response to that, the response to that is that even if, honestly, even if his first and fundamental basis was that he didn't believe the proceedings were valid, the panel is still charged with some obligation to inquire into the nature of the medical emergency before defaulting it. And so for those reasons, we would contend that the conclusion of the district court affirming the arbitration award on behalf of Bart Lebeck was unfair, fundamentally unfair to Mr. Okada. Admittedly, again, admittedly, he did not do a great job, a perfect job. There were many things he could have done better. But in face of the actual facts, which are documented, in which the panel didn't know, in which the panel simply assumed to be false based on its beliefs about his conduct in the case, fundamental fairness was denied to Mr. Okada when a default judgment was entered against him without providing him with an opportunity to testify or the consideration of his evidence. Thank you. Thank you. Okay. Mr. Berkowitz. Good morning, and may it please the court. I represent the appellant Bart Lebeck in this matter, Pele. Because Mr. Okada voluntarily walked away from the arbitration, he was not deprived of a fundamentally fair hearing when the panel resolved the case without his input. Judge Wood, you had a very clear sense of the record, and I think it's important to capture exactly what happened and what didn't happen here, because the appellant in this case has distorted the record in an effort to shoehorn this case into something that it is not. The counsel talked about the emails say what they say, written by Mr. Okada's counsel and, in certain instances, written by Mr. Okada himself and translated. And counsel said, I need to characterize that. And yes, he didn't exactly say that. The reality is that when you look at what actually transpired here, the panel almost had no choice but to do what they did, particularly in light of the conduct throughout this. So, on October 20th— Can I ask you, Mr. Berkowitz, when the panel says, like, on Monday when we—I'm paraphrasing— but essentially on Monday when we convene, we'll be ready to hear discussion about the remedy— Mr. Okada's non-appearance. Is it correct to interpret that as meaning the penalty, or does it mean something more broadly like, now how should we go about doing this? What is one to make of that? Well, what one makes of it, Your Honor, is what the panel made of it when they said we had not made any decision as to what was going to happen at that point. Mr. Okada had announced the previous night that he believed the agreement was invalid, and he'd accepted many times why it was invalid, and he said, quote, if Bartlett Beck does not agree that the alleged agreement is valid, there is no reason for me to attend the proposed arbitration. That's a separate Appendix 73. He then mentions his health, but he goes on to reiterate, even if I were to agree to participate in a proposed arbitration, I'm unable to do so due to my health. The panel then responded the next morning, the Saturday morning before the hearing. It's SEP App 78. We will hear argument first thing Monday morning as to the appropriate remedies, so both parties should be prepared to address this issue. The panel will make its decisions on the record. Thank you, and safe travels, assuming everybody was going to come in and talk about what to do, which could have included any number of things. It could have concluded, let's watch the two days of videotape deposition of Mr. Okada. It could have been, let's designate appropriate portions. It could have been, let's call him. It could have been, he's not allowed to testify, but we're going to let everything else come instead. But I take it, of course, there's never any question. Mr. Okada's a lawyer at the same time. I think Mr. Ryan, if I'm remembering, is basically saying, I'm all packed up and ready to go. I mean, so because Mr. Okada personally couldn't come didn't mean his lawyer couldn't have shown up. Yes, at CEPAP 65, I was packed, prepared, and ready to get on a plane. But what he does in response to the panel's invitation to discuss what the remedy would be to start this hearing, which, by the way, had been set since February of 2019, and a lot of expenses and so forth had been incurred, he writes less than a minute. Excuse me. He had instructed his lawyers not to appear. That's exactly right. At CEPAP 85, your honor, unfortunately, Mr. Okada, and I'm quoting, informed us that we are not authorized to attend the arbitration because he rejects the validity of the engagement agreement and objects to the proceeding. We are canceling all reservations, witnesses, and ordered services. That was done literally within an hour of the chair saying, let's get together and talk about it Monday morning. The chair had also warned Mr. Okada in her second communication to Mr. Okada after he said he wasn't coming about CPR Rule 16, which was putting him on notice that they could issue an awarded default as a sanction, which could include the record being just one that Bart LeBecq presented. And what she said to him was, Mr. Ryan, Mr. Okada's lawyer at CEPAP 68, his failure to show up for a duly and long notice hearing is material and may result in the panel finding him in default after the claimant has satisfied the panel that it has produced enough evidence and legal arguments in support of its contention as we deem appropriate. In any event, we will commence Monday with claimant's case. Then after that is when in a subsequent email, she said, let's talk about the appropriate remedy because- So let me ask you this, Mr. Berkowitz. I mean, there's an overtone of Mr. Okada's argument that somehow this is a particularly suspect award because it results from this default procedure that Rule 16 describes. I assume the reason this arbitral organization has Rule 16 is the defaults do sometimes happen, right? And they've prepared for it, just as they do in federal court for that matter, Rule 55. That is absolutely correct. And keep in mind that the CPR rules were specifically negotiated in what the district court actually described as an intense lawyer-driven negotiation. And so the CPR rules were specifically negotiated in an eyes wide open discussion over the course of a month. You mean the choice of those rules as the ones for the arbitration? Correct. And those rules, the Rule 16, people will default. And in this case, that's exactly what Mr. Okada did. He said, you know what? If you don't agree with me on liability, I'm out of here. What is somebody to do? He said, no, no, no, please come back. Really, we'll agree with you, right? There's nothing that can be done. And the panel in that case has to have rules. They put him on notice of it specifically. And that was when he instructed his lawyers not to participate. I will say, from a fairness standpoint, Rule 16 gives more rights than the federal rules of evidence under defaults. As Judge Ness found in his opinion, there are situations where a court for discovery violations can default somebody. And in certain instances, you can rely on the well-pled allegations. Here, the panel actually went through a large amount of evidence and wrote a 56 page opinion, may have been 59, I'm sorry, that was extensive, that went through everything. It even looked into the defenses that Mr. Okada had raised. And so this wasn't a situation where it was just, he's decided not to come, and so therefore, we're not going to do anything. The Bisnoff case and the Ottawa case that counsel cited, just briefly, those are both obviously non-binding cases, but they actually support Bartlett-Beck. In Bisnoff, there was a specific request for a continuance number one. Health information submitted specifically, the panel said, no, but we'll give you the option to do something in the claimant. In that case, they said, you know what, I'm not going to take you up on the offer to go videotape a deposition. And so here, unlike in Bisnoff, there was no specific request for a continuance, that we're taking our marbles and going home because you don't agree with us on liability. And there were no health information that was submitted in connection with this. The Ottawa offices case is another one where there was a specific request for a continuance, and there was health information submitted as opposed to saying, I'm ill. So this case, your honors, is the paradigm case for why federal court review of arbitrations is tightly limited. Bartlett-Beck chose arbitration in order to have an expedited review of facts. So I take it your position, I think you said this in your brief, is that it doesn't really make any difference if we're doing this under chapter two in the convention or if we're looking at chapter one, section 10. That's correct. In footnote two of our brief, we said that this is under the convention article 5.1b and not under 10.8.3 of section one. Because this is not a close case, there are not any difference. If there were a difference, our view is that article 5.1b would control because you can't broaden the rights because that would be in conflict. But here, as we said in footnote two, as similar in Johnson controls and in other cases, there's no difference. Now, ultimately, the agreement to arbitrate was agreed by sophisticated parties and it was done in order to expedite review. We are now over three years after the situation as it developed. We still haven't had review. We still haven't had a final judgment. Mr. Okada has delayed, delayed, and delayed. I assume post-judgment interest is running. It absolutely is, Your Honor. There's no doubt about that. And at the end of- What does it bring the figure to? The figure to, it was, I think, 54 million. And it's probably between 55 and 60 million would be my best estimation. But I don't want to swear under oath to that. The problem I have with this case is I don't understand that kind of number. Yeah, in a case involving- About $50 million. $50 million, is somebody really going to pay that? Or is that money laying around someplace? No, I'm being a little bit cynical about this because it just seems that this is the kind of case that sane people should have been able to work out. Now we're sitting here looking at $50 million. And I'm being dubious, does that kind of money even exist? Well, in your judgment, in a case where the amount of the settlement was $2.6 billion and the additional recovery that Bartlett Beck achieved was well in excess of $700 million from Mr. Okada's company, represents a relatively small portion of the overall amount for a billionaire to pay. And so we believe it's there and we'll collect on it. At the end of the day, what we have here is a arbitration panel that included somebody appointed by Mr. Okada that was left with the decision on how to proceed in the face of Mr. Okada's statement that he wouldn't participate unless Bartlett Beck conceded liability. Under those circumstances, the panel was more than reasonable and fair and the proceeding was conducted certainly within the bounds of due process and there was no violation of his fundamental right to a fair hearing. I appreciate your time. Thank you. Thank you, Mr. Berkowitz. Mr. Goode? Is Mr. Goode there? He's coming. I'm here, Your Honor. I know you used your time up. I'll give you two minutes. Thank you. I want to address the question that was asked of what suspect about the default here. And I think the most direct way, the most direct evidence of there being something suspect is to look at the fourth basis that the district court gave for concluding that the arbitration award was reasonable. And that was that Mr. Okada had acted in presenting a medical emergency at the last minute in accordance with prior bad behavior, prior delay tactics. First, obviously, Mr. Okada's medical emergency had nothing to do with anything else that happened in the case. And that's obviously true based on the evidence that's been submitted. But even assuming it was, even assuming that there were bad acts in the case, it's not reasonable to conclude that Okada's medical emergency was simply false because of him not making a witness available or him making scheduling his deposition difficult. That's not a reasonable ground. The panel, and effectively, that's misconduct on the part of the panel in denying the continuance because the panel is effectively arguing that because he acted in a way it didn't like earlier in the case, it didn't have any obligation to look into his medical emergency. And in fact, it went further than that. Well, it actually found him not credible in the sense that whatever this vague reference to illness may have been, I understood the panel to be more than skeptical that it was a reason to forego all participation in the hearing and to instruct his lawyer not to show up and all the other things that he did. And it just didn't believe him. The panel was more than not skeptical. The panel had prejudged his case. No, no, no. They didn't believe what he was saying. That's not prejudging a case. Panels are supposed to assess credibility. Except that we know here that the panel did because in the final award, the panel stated that it agreed with Bartlett Beck's contention that Okada pressed a meritless defense for over a year before abandoning the case. A meritless defense where he had over 300 exhibits, an expert witness, multiple witnesses. That doesn't make it a defense with merit necessarily. It means it's well, you know, there's a lot of paper on it. The obligation of the panel was to decide the merits of the case. And that would have taken place at the arbitration hearing that they didn't allow Mr. Okada to participate in. Thank you. Thank you, Mr. Goode. Thank you, Mr. Berkowitz. Thank you. Case will be taken under.